UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Joseph LARSON, a/k/a Chuck
Larson and Fred Steve Palilla,
Defendants-Appellants.

No. 74–3996.

United States Court of Appeals,
Fifth Circuit.

Jan. 22, 1976.
Rehearing Denied Feb. 23, 1976.

See also, 5 Cir., 526 F.2d 260, 526 F.2d 262.

Frederick B. Tygart, Jacksonville, Fla. (Court-appointed), for Palilla.

Robert J. Head, Jr., Orange Park, Fla. (Court-appointed), for Larson.

John L. Briggs, U. S. Atty., John J. Daley, Jr., Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before BELL and DYER, Circuit Judges, and MEHRTENS, District Judge.

BELL, Circuit Judge:

This is an appeal by two defendants, Charles Joseph Larson, a/k/a Chuck Larson, and Fred Steve Palilla, from convictions of various crimes arising from a scheme to use forged securities as collateral for loans from federally insured banks in violation of 18 U.S.C.A. § 1014, and to transport such securities in interstate commerce, in violation of 18 U.S. C.A. § 2314. Both appellants were convicted of count one of a thirteen count indictment, which alleged a conspiracy to violate these sections. Palilla was charged and convicted on only one other count of the indictment, count eight, of a substantive violation of § 1014, while Larson was charged and convicted on counts two through nine and thirteen, which were substantive offenses of both § 1014 and § 2314. Other persons named as either co-conspirators or joint-venture agents in the indictment entered pleas before trial; some of these testified as government witnesses. The other defendant at trial, James Anthony Koblein, a/k/a Jimmy Buttons, was charged and convicted on the same counts of the indictment as was Larson.

Larson and Palilla assert error in the admission of certain evidence and in the failure to sever their cases for separate trials. Larson also argues there was insufficient evidence to support his convictions. We affirm.

The government introduced background evidence to show that Larson was a close associate of Koblein and dependent upon him for all support, although neither Larson nor Koblein had any visible means of support. Palilla was not a direct associate of Larson and Koblein but was a business associate of another co-conspirator, Herman Miller, apparently through whom he met Larson and Koblein. Miller and Palilla had various business dealings over a period of about ten years both as employer-employee and as competitors in the business of laundry and uniform rental. Evidence was presented showing that Palilla was financially troubled at the time of the conspiracy.

The genesis of the securities fraud was in a conversation between two co-conspirators, Joseph Scales, a Florida stockbroker, and Frederick Hahn, in which they considered the possibility of pledging counterfeit stocks as collateral for bank loans. Scales and Hahn met with

Larson and Koblein at a Jacksonville bar known as the "Some Place Else," where Scales suggested the fraud scheme to Koblein. Koblein agreed to further the scheme by finding a Florida businessman who would have sufficient credit to qualify for short term bank loans.

Three types of genuine securities were forged and counterfeited: (1) Two 100-share certificates of Natomas Company common stock with two different serial numbers; (2) One 200-share certificate of Walt Disney Productions stock, with a single serial number; and (3) Trans World Airlines, Inc., ten per cent corporate bonds with a face value of $1,000 bearing different serial numbers. Throughout 1972, these forged securities were used as collateral for short term bank loans with banks not only in Florida but in Texas as well. The securities themselves were transported out of Florida to New York, Alabama, Texas, and even to Canada. Because only Larson and Palilla are appealing their convictions, only those incidents relevant to them will be discussed herein.

There was evidence of a trip from Florida to Birmingham, Alabama by Larson, Koblein, Palilla and another person, for the purpose of using the fraudulent securities to make bank loans in Birmingham. Palilla testified that he went along gratis only for the purpose of seeing his mother. In addition, however, Palilla introduced Larson and Koblein to a Birmingham businessman, who might have been able to make loans using the forged securities. Palilla claimed ignorance of Larson's and Koblein's purpose for the trip, but testimony by Scales and Miller suggested that he in fact was participating in the attempt to utilize the fraudulent securities.

Shortly before June 7, 1972, Palilla was given two of the counterfeit Natomas certificates by Miller who testified that he told Palilla they were counterfeit. Palilla subsequently testified that Miller said no such thing. Testimony by Palilla and Miller conflicted as to the implementation of the loan alleged in the indictment against Palilla, but, sub-sequently, Palilla asked a friend, Robert Sheridan (who had been Miller's attorney), to pledge the two certificates in his name as collateral on a $7,200 loan. The proceeds of the loan were divided among Palilla, Sheridan, and Miller, and the three subsequently shared interest payments on the loan.

There was testimony by Miller that he was unconcerned with the possibility of Palilla going to the authorities, based on his knowledge of a check fraud scheme by Palilla and another person named Tillman, and also because of Palilla's apparent (to Miller) knowledge of the counterfeit nature of the notes, based on Palilla's earlier association with Koblein and Larson. Tillman later testified that Palilla had discussed with him the possibility of using the fraudulent securities.

The success of the conspiracy depended upon preventing any of the counterfeit stocks from going into the open market, by maintaining interest payments and not defaulting on any of the loans. Unfortunately, one of the Walt Disney stocks used by Scales' brother for a loan in Orlando, Florida was detected upon Scales' brother's default. In November and December, 1972, other securities were also discovered by various banks as being fraudulent. Evidence was offered by the government of attempts by Larson and Koblein to conceal the conspiracy after these defalcations. These involved threats against Scales' brother as well as against Miller, to keep them from talking. Scales had been first indicted and convicted on some of the transactions involved but did not cooperate fully with the government until his arrest on this indictment.

*Sufficiency of evidence*

■ The assertion by Larson that there was insufficient evidence to support his convictions is so lacking in merit as not to warrant any discussion. *See United States v. Warner,* 5 Cir., 1971, 441 F.2d 821, 830; *United States v. Mikelberg,* 5 Cir., 1975, 517 F.2d 246, 252; *United States v. Parr,* 5 Cir., 1975, 516 F.2d 458, 463–64.

*Prejudicial testimony*

█ Larson argues that there was plain error in the admission of five pieces of testimony, in particular, that he was a hit man, that Frederick Hahn was "scared" of Koblein and Larson, that Koblein and Larson threatened another witness, Robert Wheeler, that Koblein and Larson gave the appearance of being associated with the Mafia, and that a threat made by Koblein was attributed to Larson. The government response is that all of this testimony was relevant to proof of the conspiracy, as to either motive or efforts to conceal the conspiracy after it began to fall apart. *See United States· v. Nakaladski,* 5 Cir., 1973, 481 F.2d 289, 296; *United States v. Arias-Diaz,* 5 Cir., 1974, 497 F.2d 165, 169–70; *United States v. Crockett,* 5 Cir., 1975, 514 F.2d 64, 71–73. Moreover, the government argues that Koblein's defense counsel opened up these issues on cross-examination of government witnesses, without any objection by either Larson or Palilla. In particular, in the attempt to discredit Scales, Koblein's counsel opened the issue of collateral crimes contained in Scales' plea bargain, *see United States v. Gonzalez,* 5 Cir., 1974, 491 F.2d 1202, 1204, as well as Scales' need to explain the prior inconsistencies based on his fear of Larson and Koblein. *See United States v. Cochran,* 5 Cir., 1974, 499 F.2d 380, 387–88.

Palilla complains about seven instances of testimony ostensibly offered only to prove his bad character. They are as follows: that he engaged in the used car business, that he went on gambling trips during 1972, that he was separated from his wife, that he engaged in a fraudulent advertising scheme against Miller, that he engaged in a fraudulent check scheme (for which he had been acquitted in federal court), that he owned land with title in a straw man to avoid creditors, and that at a time when he was ostensibly in financial distress he had a "wad of money."

█ The first three facts were, in the view of the government, relevant to Palilla's need for money, which was a motive for his participation in the conspiracy and the fraudulent loan transaction. *See United States v. Nakaladski, supra.* The last four facts were brought out on redirect examination in response to cross-examination of Miller by Palilla. These related primarily to the relationship between Palilla and Miller which had been extensively covered on cross-examination by Palilla. *See United States v. Gonzalez, supra.* In addition, the evidence of the check scheme, although facially prejudicial, was tempered by an instruction of the trial court to the jury that it should be considered not for the truth of the matter but only in weighing Miller's explanation of why he did not fear Palilla would go to the authorities with the counterfeit stocks. Finally, the testimony about the "wad of money" was offered to show Palilla's benefit from the stock fraud scheme. *Cf. United States v. Michaelson,* 9 Cir., 1972, 453 F.2d 1248.

Palilla also complains of the failure to strike the testimony of the witness DeBruner when DeBruner could not identify Palilla in court after not having seen him for a year and a half. This goes to the weight to be given DeBruner's testimony by the jury rather than to its admissibility and was not error.

*Severance*

█ At no time either before or during the trial did Larson move for a severance by the trial court. The matter was only arguably raised on his motion for new trial where he stated that it was error not to sever as to "matters herein." Thus the burden is on Larson to demonstrate actual prejudice resulting from the failure to sever his trial from that of Koblein and Palilla. *Tillman v. United States,* 5 Cir., 1969, 406 F.2d 930, 934–35, *vacated on other grounds,* 1969, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742; *Gordon v. United States,* 5 Cir., 1971, 438 F.2d 858, 878–79. There was clearly no improper joinder of defendants in that both Larson and Koblein were involved in all counts of the indictment and be-

cause there was an underlying conspiracy count as well. *Gordon v. United States, supra.*

■ The only basis for challenge here is the argument that Larson was prejudiced by the greater weight of testimony against Koblein. There was no claim that a co-defendant's testimony was consequently unavailable, or that the jury was in any way confused by the number of defendants or issues, *cf., Tillman v. United States, supra,* or that co-defendants had antagonistic defenses, *see United States v. Johnson,* 5 Cir., 1973, 478 F.2d 1129. A defendant cannot claim prejudice from failure to sever merely because his likelihood of acquittal is not as great in a joint trial as in a separate trial. *Cf. United States v. Harris,* 5 Cir., 1972, 458 F.2d 670, 673. Moreover, the judge below appropriately instructed the jury as to their duty to consider the guilt of each defendant separately; this instruction was given to the jury near the end of the judge's instructions, such that it cannot be argued that it did not make an impression on the jury. *See United States v. Boyd,* 5 Cir., 1971, 436 F.2d 1203, 1205.

■ Palilla argues that the admission of the evidence of bad conduct and crimes of Larson and Koblein was so prejudicial as to deny him due process of law, by suffusing the case against him with the penumbra of their bad character. It is true that his participation in the conspiracy was not as great as that of Koblein and Larson, and that he was charged with only one substantive offense. Having been properly joined as a defendant, however, under Rule 8, F.R. Crim.P., his only relief was to move for a severance of his case, the granting of which is in the sound discretion of the trial judge. *United States v. Crockett,* 5 Cir., *supra,* 514 F.2d at 70–71; *United States v. Laca,* 5 Cir., 1974, 499 F.2d 922, 924–25. He so moved and the court denied his motion. He must therefore show actual prejudice to require reversal of his conviction. *Tillman v. United States, supra.* We find no such prejudice.

Affirmed.