**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lynn Boyd STITES, Defendant–
Appellant.**

No. 94–50123.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 3, 1995.

Decided May 26, 1995.

As Amended June 27, and Aug. 2, 1995.

a lawyer and at least twelve other lawyers were his principal confederates in carrying out the fraud. The mentality that sees law as a business was here taken to a reductio ad absurdum—litigation was unconscionably churned to make money for the lawyers. The essence of Stites's scheme, repeated over and over again, was for Stites to control both sides of suits in which insurance companies were paying for counsel, and to assure that the plaintiffs' lawyers would not settle until the insurance companies would no longer pay the costs of defendants' counsel. Stites's network of lawyers was known as "the Alliance." According to the jury verdict in this case, Stites's scams extracted at least $50 million from the insurers in the period 1984 to 1987.

## PROCEEDINGS

Stites and his confederates were indicted by a grand jury. Some of the defendants pleaded guilty; others went to trial and were found guilty with their convictions being affirmed on direct appeal by our memorandum disposition of June 15, 1994. Stites himself had fled the state while he was being investigated and before he was indicted. He was not present when his codefendants were arraigned, pleaded guilty or went to trial in 1991. In 1993 he was apprehended in Illinois and returned to California for trial. The interaction with Stites's trial of two lawyers, Brooks and Mesereau, present at the proceedings involving the codefendants, creates the principal issues on appeal.

*Brooks.* Among those who pleaded guilty was Cheryl Dark, Stites's sister. She was not herself a lawyer but was inserted into at least two law firms by Stites to supervise billings connected with his fraud. She entered a plea bargain, a condition of which was that she testify against her brother, and pleaded guilty to one count of mail fraud.

Cheryl Dark was represented in these proceedings by Juanita R. Brooks, a San Diego attorney. During the period Stites was under criminal investigation before the indictment, Brooks had represented Stites. When he fled the jurisdiction, Brooks dropped him and took up instead the representation of

Bernard G. Skomal, San Diego, CA, for defendant-appellant.

Alan D. Bersin, Bruce R. Castetter, William Q. Hayes, Asst. U.S. Attys., San Diego, CA, for plaintiff-appellee.

Before NOONAN, O'SCANNLAIN and LEAVY, Circuit Judges.

NOONAN, Circuit Judge:

Lynn Boyd Stites appeals his conviction of violation of 18 U.S.C. § 1962(c) (RICO) and of twelve violations of 18 U.S.C. § 1341 (mail fraud). His principal issues on appeal are challenges to the disqualification of two lawyers he wanted to represent him. Holding that the district court properly disqualified the lawyers, we affirm his conviction. On one aspect of his sentencing, we remand for resentencing.

## FACTS

From the perspective of the government, it was established at trial that Stites had been the mastermind of a massive set of breaches of professional responsibility and of the criminal law, the more heinous because Stites was

Cheryl Dark. Brooks advised Dark on the plea bargain. She also acted for her at sentencing in 1991 before Judge Judith Keep. The brief for Stites on this appeal conveniently summarizes what Brooks told the court. Her argument mitigated Dark's culpability by magnifying Stites's, so that Stites appeared as "a wicked person, fully responsible for [Dark's] crime. Among other things, Ms. Brooks called Appellant 'the mastermind,' 'a thief and a fraud,' 'a cheap con artist,' and 'one of the biggest cons this system has ever seen.'" Stites, Brooks told the court, had "ruined her [Dark's] life." Brooks also told Judge Keep that she would not "dispute the probation officer's characterization of the fraud in this case as being massive." She added for good measure that "as an officer of the court and attorney myself, it makes me angry to see that people are' able to so pervert our system of justice."

In connection with the sentencing, Brooks submitted to Judge Keep a psychiatric report on Dark's relation to her brother and a report on the psychiatric therapy Dark was undergoing. The psychiatrist noted Stites's psychological abuse of his sister and analogized it to the pattern seen in battering relationships. Dark was reported to have had "a lifelong symbiotic relationship" of dependence on her "sociopathic" brother.

Brooks won a light sentence for Dark. Two years later, when Stites went to trial, he chose Brooks as his counsel. Judge Keep and the government objected to this choice. Judge Keep noted that Fed.R.Crim.P. 44(c) requires the court promptly to inquire into representation by the same counsel of two defendants jointly charged with a crime. Dark and Stites, although tried at different times, were jointly charged. The Rule provides: "Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel." Judge Keep scheduled a hearing to explore the possibility of conflict.

Used as he was to manipulating lawyers, used as he was to treating law as a business and legal skills as commodities to be bought and sold, Stites was apparently unaware of the impropriety of hiring a lawyer to tell the court a different story from the one she had previously told. He thought of his lawyer as a hired gun, a mouthpiece for him, willing, if paid, to say what he needed for his defense.

Represented by separate counsel at the hearing, Dark waived her attorney-client privileges as to her communications with Brooks. Stites heard what Brooks had said about him in the earlier argument to Judge Keep, but continued to insist that he wanted Brooks as his lawyer. Judge Keep expressed doubt about the voluntariness of Dark's waiver. Brooks said that she would meet that problem by not cross-examining Dark if Dark testified at Stites's trial. Co-counsel would do the cross-examination; "a Chinese wall" would prevent any communication from Brooks to her cross-examiner divulging Dark's confidences as a client. Brooks argued that she had worked for Stites since 1988 (with the relationship being in abeyance when Stites was "not before the court"); that she was familiar with the facts of the complex case; and that Stites, conscious of all that Brooks had said of him to the court, was himself an intelligent lawyer intelligently preferring her now as his counsel.

Judge Keep found, first, that Dark was competent in general, but that "a lifetime pathology" in relation to her brother could not be "changed by a year of psychotherapy"; the sister was still submissively dependent on the brother; she was not capable of knowingly and intelligently waiving her attorney-client privilege (ER 125). Judge Keep further found that she could not be sure that a Chinese wall between Brooks and her cocounsel would not "crumble" under the stresses of the trial. Consequently, she found Brooks bound by her obligations to Dark, and that therefore an "actual conflict" prevented Brooks from representing Stites.

Judge Keep also took note of Brooks's claim that Brooks had represented Stites since 1988 and observed that if this relation-

ship had been made known to her at the time of Dark's plea she would have wanted to be sure then that Dark had independent counsel. Brooks had not made it known. Judge Keep expressed surprise that Brooks had abandoned Stites for Dark if the attorney-client relation with Stites had been so important. Judge Keep reviewed the harsh characterization Brooks had offered her of Stites as part of Brooks's argument for Dark. Judge Keep disqualified Brooks, who was replaced by Jennifer L. Keller and Thomas Stepp.

*Mesereau.* Thomas A. Mesereau, Jr. represented Stites in civil litigation involving many of the same issues. On May 9, 1991, while the government's case against Stites's codefendants was nearing completion, Mesereau came to San Diego from Los Angeles, spoke to a juror outside the courtroom and asked the juror how the case was going and what evidence he had heard relating to Stites. In particular, Mesereau wanted to know if witnesses had been saying bad things about Stites. Mesereau asked the juror if the United States had a good case. According to the juror Mesereau told him, "You know the U.S. Attorneys aren't always, you know, telling the truth."

The juror brought this incident to the attention of the trial judge, Judge Newcomer, who thereupon held a hearing. At the hearing Mesereau was asked why he had come to the courtroom. He replied that it was out of pure curiosity. He answered evasively when asked if he still represented Stites. He stated that he did not feel that he had done anything improper in talking to the juror.

Judge Newcomer then issued an order to show cause why Mesereau should not be held in criminal contempt of court. At this hearing Mesereau testified and called witnesses. Judge Newcomer concluded that there was insufficient proof beyond a reasonable doubt that Mesereau had intended to obstruct justice, but he found Mesereau's conduct to be "unethical, improper and possibly criminal." This finding, made in 1991, became relevant in 1993 when Judge Newcomer returned from Philadelphia to San Diego to preside at Stites's trial as he had at the earlier phase involving the co-defendants.

In June 1993, one of Stites's trial lawyers, Thomas Stepp, died. Stites replaced him with Mesereau, who was familiar with some of the intricacies of the case from his representation of Stites in the civil litigation. On August 30, 1993, the defense informed Judge Newcomer in Philadelphia of this selection. On September 8, 1993, the government objected to Mesereau's appearance. Trial was scheduled to start five days later. At the beginning of the trial, Judge Newcomer took note of his earlier finding and ruled that Mesereau could not act in the case. The remaining Co-counsel, Keller, objected that she was not prepared to proceed alone and asked for a continuance. The continuance was denied and she was told to go ahead.

Stites's appeal focuses on the disqualification of Brooks and Mesereau and further raises two questions as to his sentence.

## ANALYSIS

### The Disqualification of Juanita R. Brooks.

 The presumption is that a criminal defendant may have counsel of his choice if he can pay for it and counsel is willing. *Wheat v. United States,* 486 U.S. 153, 164, 108 S.Ct. 1692, 1699–1700, 100 L.Ed.2d 140 (1988). The presumption, however, may be overcome by even "a showing of a serious potential for conflict." *Id.* The presumption, in practice, is subject to "the substantial latitude" that the Supreme Court has instructed us must be extended to the discretion of district judges ruling in these cases. *Id.* at 163, 108 S.Ct. at 1699. Substantial latitude is necessary to avoid the district court being whipsawed—damned if it does and damned if it doesn't disqualify. *Id.* at 161, 108 S.Ct. at 1692. The danger of whipsawing is especially acute when the defendant himself is a lawyer marked by cunning and ethical obtuseness.

 Fed.R.Crim.P. 44(c) further affects the presumption by admonishing the district court to take appropriate action in the case of the same counsel representing joint defen-

dants "[u]nless there is good cause to believe no conflict of interest is likely to arise." In this case there was not only serious potential conflict but actual conflict of interest, and Stites failed to show good cause that the conflict was unlikely to continue.

■ An actual conflict existed because Brooks had represented Dark in the same case in which she now sought to represent Stites. She was bound by her duty to her former client not to enter into a relation where she would, almost by necessity, have to draw on knowledge she had obtained in the earlier relationship. Dark tried to waive the duty. The Supreme Court has held: where a district court finds an actual conflict, "there can be no doubt that it may decline a proffer of waiver." *Id.* at 162, 108 S.Ct. at 1698–99. Judge Keep did so here.

■ That is the short answer to Stites's appeal. But Judge Keep did more. She found as a fact that Cheryl Dark was not competent to waive her right to have her communications to her lawyer, Brooks, kept confidential. As her waiver was invalid, there was, as the district court found, an actual conflict between Dark's interest and Stites's. Brooks was disabled from acting for Stites.

It is argued on appeal that Dark was competent and so was mentally fit to determine if she wanted to waive her rights. Competency, however, is one thing; voluntary and knowing waiver of a constitutional right is another. *See U.S. v. Christensen,* 18 F.3d 822, 826 (9th Cir.1994). Because of Dark's pathological dependency on Stites, Dark could not freely and intelligently waive her right to confidentiality when her brother was the one who asked her to do so. We have no basis to set aside Judge Keep's finding as to Dark's lack of capability to knowingly and voluntarily make this decision.

■ Stites presses that a pledge by Brooks to keep the confidences and set up a Chinese wall cured the difficulty. Judge Keep had reason to treat this proposal skeptically. Brooks had represented Dark in 1991 without disclosing to the court her three-year association with Stites as his counsel. Judge Keep was not under any

necessity to accept an unusual arrangement, almost impossible to monitor. The Chinese wall might have crumbled. It was within the discretion of the district court to reject it.

■ Stites also argues that the government's indication that Dark would be a witness was a bluff—proved to be a bluff because the government never called her as a witness against Stites. It is suggested that the bluff was merely a ploy to disqualify Brooks. To the contrary, the plea agreement by which Dark agreed to testify against her brother was entered into long before it was known that Brooks might represent Stites, and it was entered into by Dark when Brooks was Dark's counsel. As the case appeared to the court at the time of the disqualification hearing, Dark was a probable witness—an insider who had actively participated in the fraud and whose testimony against her brother might be especially damaging. The government did not have to formulate its final trial strategy nine months before trial. At the time of the disqualification of Brooks, Dark was properly viewed by the prosecution and the court as a witness who might be called. As such, absent a knowing and voluntary waiver, her lawyer could not act for the defendant against whom she would be called to testify.

■ Brooks's inability to act in this case for Stites is evident on another basis visible in the record. She could not, in the very same criminal prosecution, tell the court that Stites was a liar, a thief, and the mastermind of the massive fraud charged by the government and then represent the same person contending that he was innocent of the crimes charged. Lawyers, all know, may change their position on the law from case to case without disgrace. But when, as Brooks so pointedly put it to Judge Keep, she as an attorney and officer of the court was offended by the criminal deeds—"the massive fraud"—of Stites, she could not swallow her words and present Stites as an innocent man. Students of the classics may recall Cicero's comment that speeches at trials are for "the case and the occasion," they do not disclose "the man himself." But even if a certain insincerity may accompany the filling of an

advocate's role, nothing in our professional ethics permits an advocate to tell a court one set of facts today and a contradictory set of facts tomorrow.

### The Disqualification of Thomas A. Mesereau, Jr.

■ Mesereau had misconducted himself in the same case, and his misbehavior had been stamped as unethical by the trial court. At the time of the court's ruling Mesereau was not counsel of record for anyone; at that time there would have been no point in barring him from the court. When two years later he presented himself before the same judge in a trial that was part of the same prosecution into whose conduct he had flagrantly inserted himself, the judge did not have to accept his participation. Mesereau's conduct had been unbecoming a member of the bar; he was properly barred from appearing. *See United States v. Stoneberger,* 805 F.2d 1391, 1393 (9th Cir.1986).

■ Stites objects that the sanction imposed on Mesereau infringed his Sixth Amendment right to counsel. That right is not absolute; its purpose is to secure fairness in the trial, *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697, and, as in *Wheat,* it must give way to preservation of the integrity of the proceeding. The defendant in this case committed his crimes with an extraordinary absence of awareness of the ethical duties of his profession. He chose his counsel in the case of Brooks and Mesereau with an equal indifference to ethical conduct of his counsel. He cannot complain because a well-informed trial court would not let a lawyer who had already grossly misbehaved in the case return to the scene of his misbehavior.

### Sentencing.

Stites's sentence was enhanced for obstruction of justice and for significantly disrupting a governmental function. As to the latter, the jury verdict and the court's express finding at sentencing established that the essence of Stites's scheme was the abuse of the judicial system. On appeal he presents nothing to controvert this conclusion.

■ As to the former, the government points to Stites's flight from the jurisdiction, his determination to remain away until the trial of his co-defendants was over, and his use of aliases while in hiding. However, flight by itself is not an obstruction of justice. *United States v. Madera–Gallegos,* 945 F.2d 264, 267 (9th Cir.1991). Stites's purpose in remaining away did not aggravate his flight; and his aliases did not prevent his apprehension. *United States v. Mondello,* cited by the government, involved a defendant who "had already been arrested for his offense and was expected to surrender himself." 927 F.2d 1463, 1467 n. 4 (9th Cir.1991). To disappear from the jurisdiction and not disclose one's whereabouts to the government does not warrant enhanced punishment. *United States v. Alpert,* 28 F.3d 1104, 1107 (11th Cir.1994) (en banc). Nor do we accept the ground not relied on by the district court although urged by the government, that Stites obstructed justice by, on the advice of his attorney, not providing his current financial data to the probation officer. Cooperation with the probation officer is not required of a defendant at peril of increased imprisonment.

The judgment of conviction is **AFFIRMED.** The case is **REMANDED** for resentencing in accordance with this opinion.